Case number 231780 and 231820, Quickway Transportation Inc v. NLRB. Mr. Whalen, you may proceed. Thank you, your honors. I may please the court. My name is Eddie Whalen. I'm from the Tennessee Bar, and I'm here representing the Quickway Transportation, the petitioner cross-respondent, and its company pallet owner. Your honor, what we have here today is basically the National Labor Relations Board is trying to change clearly established, long-standing Supreme Court precedent. The Darlington case and the First National Maintenance case. And they're trying to interpret it in such a way, their own way, which would effectively take Darlington out of the picture and put new reasons why First National Maintenance are not there. That's Supreme Court precedent. This court's bound by it. We're bound by it. The board's bound by it. And that's ultimately what we're dealing with here, but a relatively unusual... I thought that the NLRB was applying Darlington. They're not applying Darlington. In fact, what they're saying is that Animus alone is enough, that you don't need to have Chili, which is what Darlington said. If I may, your honor, Darlington was, in 1967, Darlington established two things. It established, number one, that any company had the right to terminate their business and close their business for any reason. Union Animus, and Union Animus was there in Mr. Milliken and the Darlington case, so that was taken for granted. Even if it's Union Animus, they have the right to do that if they're going out of business. It said with a partial closure, where a company is closing a particular facility, then you look at whether or not that was motivated by chilling, an intent to chill, union activities at other facilities, at least assuming that the plant has other facilities, and that it must prove chilling, the general counsel must prove chilling, and they must prove that there is a reasonable foreseeability that the chilling effect would be... You can see that if you close this plant, that it's going to have an effect on another plant. And that's what Darlington... So everybody's applying these standards. Is your concern a misapplication of law? And if so, could you describe it to me? Or is your concern just there wasn't sufficient evidence to meet Darlington's standards? The answer is both, your honor. There's not sufficient evidence and substantial evidence in the record to support what the board... Yeah, well, that would be a fact-bound... But to the extent that it's a conclusion of law under the Bright... Excuse me just a moment. The Bright case, it's... I can't think of the first name...  Gloper, right. Thank you. The court said that it was this court's duty to review questions of law with no deference... Yeah, but it's your duty to raise the questions of law. Excuse me? It's your duty to raise the questions of law that we are supposed to review. Yes, sir. And we believe that. I was unclear what those questions of law are. The questions of law are whether or not substantial evidence on the record as a whole supports the findings and the inferences that they've done and what they've constructed. And it's also whether or not they can disregard statutory directives. And they say, well, it's animus animus. That's what this whole case is about. They keep saying animus, all of which is based on inferences drawn from situations that they admit are legal and lawful. But they're taking those and coming out with an adverse inference about another inference and saying that's animus. And they're saying that animus is enough. That is not what Darlington said. Darlington assumed that there would be animus. And it doesn't matter. The animus doesn't matter. It's chilling is the answer. Why isn't there substantial evidence of chilling here? Because, first of all, none of these inferences are supported by substantial evidence. There's no supporting evidence there. And second of all, the overwhelming evidence is that the clients and the testimony is that they did this because the union was going to have a strike to close down the KVA distribution center. And they were able to close it completely because the two union employers that were their employees had contracts that permitted them to engage in sympathy strikes. So they would have shut down the KDC in its entirety. 242 stores in four states, no groceries for two weeks before the Christmas holidays and the other holidays. What is the evidence that the strike was going to happen on December 10th? So I recognize there's the media announcements. The proof that was there was a very plain and very straightforward and very persuasive announcement that the strike was going to be. It was made by someone who obviously came to Kroger through the media and Kroger brought it to our client. And it came through the media and it said that they had a strike vote. They were going to go on strike. But isn't it conceivable that the strike vote could have been conditional if the negotiations broke down? Well, what the announcement said, Your Honor, was that the next meeting was December 10th. This happened on December 7th. This whole decision that we're dealing with here was the company made was made in a 24-hour period from 8 o'clock in the morning on Wednesday the 8th until 10 o'clock in the morning on the 10th, the next day. So it was a very rushed thing quite, but basically it said if there was not an agreement reached, if they didn't agree to the union proposal on the 10th, there would be a strike. So it was a fait accompli. No, there could be agreement or there could be negotiation. It was a strike authorization in the future if things didn't happen. Well, we don't know, Your Honor. We believe that the plan was it was going to strike. They struck that morning with pre-printed picket signs with the names and stuff on them. So it was very, very evident that they could close it down and that they were going to close it down. And that was what my clients believed. Did the board rely on various indicia that there was a chilling aspect here in that it was not just shutting down this particular plant, but that the company was worried about pro-union activities at other plants? They make that argument, Your Honor, but they don't have any supporting evidence. Well, we have evidence in the record about comments to, I mean, orders not to have the Murfreesboro drivers come to Louisville because it can, you know, the union people will infect Murfreesboro. Right. We have Mr. Hendrick talking about, you know, the unions coming from Hebron. I mean, I don't need to detail everything that the board did there, and it's a pretty lengthy decision. But it did rely on evidence, on emails from Mr. Cannon and things like that. I mean, we don't have a lot of latitude to second-guess fact-finding here. Well, Your Honor, it's the inferences that they draw from those. All of those communications were legal. Right, right. We're not saying, I don't think the union or the board is saying that those were illegal themselves. But the question, as I think you articulated, is what evidence of chilling is there or a desire to chill? And can't they show, even if legal, can't they show a desire to chill? There's no evidence of a desire to chill, no substantial evidence. The only potentially arguable evidence doesn't have to do with Murfreesboro. It doesn't have to do with Hebron. There's no proof of those. There's no proof the company reacted or did anything because they thought it was imminent. The only proof that the general counsel put on, they called one driver out of Indianapolis who testified that there was incipient organizing, they were thinking about forming a committee in Indianapolis and that the company knew about it. He was put on the stand and he had given a declaration a month or so before, which was totally contrary to his testimony. The company, no, not an employee, the former terminal manager came in and said that never happened, and the judge discredited his testimony. So the email from Mr. Cannon where he's expressing about stopping Murfreesboro drivers from coming and saying you don't want, quote, the union to infect our Murfreesboro fleet, that doesn't evince any desire to make sure union activities don't spread. No, no, it doesn't, not in those circumstances. Yeah, explain to me. Number one, Murfreesboro was a couple hundred miles away. Murfreesboro was even in a different jurisdiction. It wasn't even the same union. And basically what Mr. Cannon was doing was putting back what it was. It used to be the work of Louisville, and he was putting back the way it was. And he did say so that they wouldn't be communicating with the union to be infected. He used those terms. But there was nothing, no follow-up, no evidence of anything. There was no evidence of any union activity ever in Murfreesboro. The evidence is that he didn't know of any union activity. He was just trying, and his testimony was I had a lot going on. I had this campaign. At that time the union campaign was going on. I was just trying to get this and try to not have another fire start somewhere else. That's what he did. There's no evidence that any employee. He wasn't just saying that you don't want a fire to start somewhere else, a union organizing campaign to start somewhere else. I mean that's, if you're telling me that that's the inference, why can't the board rely on that? I'm not saying that is the inference, Your Honor. I'm saying that that's what he was thinking, and that was never communicated to anybody. It was an internal communication of the company. And there was nothing done with that other than that. Basically he just took and put it like it used to be because they had switched it over so the work was going back to Louisville. If anything, he was giving them more work. But there was no evidence of any chilling from that or anywhere else. The only thing they brought out was Johnson, and he was discredited, and then he testified, hearsay testimony of alleged conversations that other employees said about there goes our campaign. None of those people were called as witnesses. It was just Johnson. Thank you. Your time is up. I have not served. And be firm for everyone. All right, Your Honor, and I've reserved, I think. You were warned. I've reserved five minutes. Thank you. Yes. Good morning. May it please the Court, Joel Heller for the National Labor Relations Board. The core question in this case is Quickway's motive in shutting down its Louisville operations, which is a question of fact that the Court reviews for substantial evidence. And the credited record evidence shows and supports the Board's findings that Quickway shuttered its Louisville operations because its employees there voted to unionize and to chill, organize an activity at its other locations. Quickway's arguments on appeal are largely about fights over what the record shows, but that's insufficient to overturn the Board's decision under the Court's standard of review. And the Board in this decision found both evidence of animus in shutting down the terminal at Louisville and also evidence of an intent to chill. You look at pages 10 through 13 of the Board's decision, that in three, four pages of analysis about intent to chill. So the Board clearly applied the Darlington standard and looked at both of those requirements under Darlington. So it applied Darlington. It was not making new law here. In finding that the decision to close the Louisville terminal was motivated by union animus, the Board detailed a series of threats, interrogations, acts of surveillance that Quickway engaged in both before and after the drivers there voted to unionize, including, of course, threatening the employees that if you vote to unionize, Quickway's going to shut down the facility, which is what happened. There's intent to chill. We've talked some about the Murfreesboro, which I think is pretty strong evidence. They're saying that if the—not just saying it, not just a communication in this email, but taking action, redirecting the Murfreesboro drivers so they didn't come to Louisville for the express purpose of preventing them from communicating with the union reps there so that that didn't infect the Murfreesboro drivers. We also have the email from Donald Hendricks saying the Teamsters are coming for Hebron, and the Quickway's response to that was not just to ignore it, but to say, well, we need to send this guy a cease and desist letter. We should sue him for threatening to harm our business. There was the email about the Indianapolis—well, there was an organizing drive at Indianapolis, but I should point out under Darlington, what the board has to show is not that the employer necessarily knew that there was organizing activity elsewhere, but that it believed there was organizing activity elsewhere, because the question, again, is one of motive. What did the employer believe? Your friend says the motive is financial ruin. If there is a strike and they can be on the hook not just for Quickway's workers, but also for the two other companies operating there who will go on strike with them, I mean, they're looking at balance sheets. Sure, and that is their position. Right, so how do you respond? They say it is an act of business judgment, but it's not an act of business judgment just because of their say-so. That is the question in this case. Was it a legitimate, if maybe ill-informed, business judgment, or was it to retaliate against employees for unionizing? And the board's finding was the latter. So the question is, does substantial evidence support that finding? Whether or not there might be evidence to support a different finding isn't the question on appeal. But more specifically, my response to Judge Blumenkatz is that that belief, that stated belief that financial ruin, that's why we stopped, is based on a series of unsupported assumptions, one of which is that the strike was going to happen on December the 10th. There was discussion earlier. There's not actually evidence that there was any plan of that, let alone evidence that Quickway knew about at the time. There was an authorization to strike, right? There was an authorization to strike, yes. But two things about that. One is, just as a factual matter, there was not an authorization to strike on December 10th. What the union asked for was authorization to strike at such time that the union might deem it necessary. But, of course, Quickway didn't know that at the time, and we have to look at what Quickway knew at the time. Can I ask, in the record, this is just a little factual point, is there evidence that the union was aware of this press release that Kroger got that then Quickway was made aware of? Was the union also made aware of that? No. There was testimony from the union rep that he was not, that no one from the media asked him any questions. So they didn't know about this until the closure? Is that what the record shows, or what the board found, about the fact that there was kind of a media release about a strike on December 10th? Right. There's no evidence that the union knew about it. Quickway didn't reach out to the union. Quickway didn't do any investigation to corroborate what was a, if not anonymous, then it was not clear who the inquiry came from. Kroger, sorry, the news stations that sent it to Kroger, but then sent it to Quickway. So the news station says, we don't know who sent this to us. It was from an iCloud.net email address, so we don't actually know who this person is. Prevost, the CEO of the Paladin Enterprises, testified that he didn't know who this inquiry came from that was sent to the media. And I think there is some evidence that it came from this fellow Donald Hendricks, but again, Quickway didn't know that at the time. But even if that was true, he was a former employee. He wasn't at the strike authorization vote, so he doesn't have any of this information that it happened, that it was going to happen on December 10th. So some of the other unsupported assumptions, this idea that Quickway was going to be responsible to hire replacement workers for the other companies that worked at the Louisville Distribution Center. Their main reason for arguing this is that the VP at Kroger, Joe Obermeier, told them that, but there's no evidence of that in the record. That is, well, rather, that is their own view of the evidence. There's some testimony that someone said that that's what he said, but Joe Obermeier himself testified, and he didn't agree with that. He said, when asked, what did you tell the Quickway folks, he said something different. He said that they were going to have to, I believe it was something like, maintain their obligations under the contract. He didn't talk about monetary responsibility. He didn't talk about hiring replacement workers for these other companies. Indeed, there's evidence from Quickway's own witnesses who said, we didn't talk to anyone at Kroger, at Transervice, at Zenith, about whether we would have to hire replacement workers. That's at JA 1173 through 1174. One of Quickway's witnesses testified he actually had no idea whether the Zenith or Transervice could hire their own replacement workers. Can I ask you, I don't mean to cut you off, but to turn to a different subject. I was curious, so the board's position is that the board has no duty to disclose favorable evidence under Brady to a party that the board is prosecuting? You cited quite a few cases here for that proposition, but why does the board take that position? Why wouldn't you want to disclose favorable evidence? I think the difference between criminal prosecutions and what's going on in the board hearings, so that's one. Why is it as a basic matter of fairness? It seems to me that the government should potentially be taking the position that it should disclose whether it's civil prosecution, criminal prosecution, admin proceedings, other proceedings. So the board just has consistently said we can hide favorable evidence? The board has said there is no, usually how this comes up is the party will file a motion before the administrative law judge asking for disclosure of any exculpatory evidence, and the board has consistently denied those motions, as have I believe four courts of appeals have argued that that's not the case here. In addition to the distinction between the criminal context and this context, the pre-hearing investigations that the board does or witness statements are considered confidential, and the Supreme Court, it's a FOIA case so it's not right on point, but the Supreme Court has agreed that these are confidential documents in a case called Robbins Tire and Rubber. I assume Brady, though, comes out of the due process clause, so it doesn't come out of a criminal provision, so it's not necessarily limited to the criminal context. As a matter of first principles, I suppose not. As far as I know, it's only ever been applied in that context, and of course even if you want to think further about the issue here, they haven't shown any, it's been a while since I studied criminal procedure, but I think it's materiality and exculpatory nature of the evidence. They haven't shown prejudice, essentially, what evidence is out there that would have changed the case at all. Yeah, and can I just maybe turn a little bit to the remedy now? The restatement remedy strikes me as, so usually you would think compensatory damages are what you should get in this circumstance. Obviously the board is limited in its power to award those types of damages. So how are you going to determine whether the company has complied? What if Kroger refuses to contract? It seems quite unusual for me to have a remedy that says, you need to go out and get business for these truckers, and if you can't, I don't know what happens if they can't get the business. Well, that is actually built into the board's remedy. It's essentially kind of a staggered remedy for the restoration order. There's back pay and reinstatement. Yeah, yeah, I got that. But for the restoration order, well, one, that is just as a general matter, but I will get to your specific question. The restoration order is considered the presumptively appropriate remedy for these unlawful closures. And is that just because of the statute? Because you would think, like in tort law, the presumptive remedy is not an injunction. The presumption remedy would be damages. And I suppose the presumpted remedy has just developed as this type of injunction duty to go engage in business activity to try to remedy the problems because of the limits on the board's power. I mean, it is, it restores the status quo, and that is the kind of general equitable principle, or sorry, general remedial principle underlying. I mean, but if I was thinking about it from first principles, I would think that the obvious remedy is not to require somebody to, I mean, think about a breach of contract. Normal, you don't require them to, you don't enjoin them to, like, deal with their partners. You just give them money damages. Right, and part of that, I think, yeah, you're right, is that the board doesn't have power to issue those kind of damages. So the second, what would otherwise be seen as a second best remedy is the remedy chosen by the board because, just because the board's limited power, I suppose. I suppose. So then you just, is it a good faith test? Because I do worry about, well, can you hold them in contempt if they don't negotiate hard enough with Kroger to get a good deal? That's where I, and now I'll actually answer your question, so I apologize for that, but for that detour. So what the board's order says is, one, restore the operations as they existed on December 10, 2020.  Actually, it says make a good faith effort within a reasonable time. Okay. If you're unable to do that, it then says, goes on to say, well, then we will have, you can order, you will give reinstatement to as many employees as you have worked for with the business you have managed to drum up. If it's not sufficient to reinstate everyone, you then offer reinstatement at their other facilities. And then if you still don't have enough for everyone, you put them on a preferential hiring list. So this is all spelled out in the board's decision. I'm sorry, I'm flipping through here. I'm trying to find the exact page, but it is in there. I'm just making it up. The other point I would make is that even though they walked away from the Kroger contract at Louisville here, they still have an ongoing relationship with Kroger. They have received requests for proposals from Kroger. They've actually received more Kroger contracts even after the incidents in this case. So it's not like they're somehow blacklisted from Kroger. So it's possible that they could get this work again. But even if they don't, like I said, the board has these kind of fallback positions. What was your position on forfeiture? Was it that their entire remedy argument was forfeited or just the argument that the board improperly imposed compensatory type damages? The latter, yes. That was not raised below the challenge to what they call consequential damages. One other point I want to make clear is that the driver, Johnson, from Indianapolis, he was discredited on one particular point, but not more generally. What was discredited was that he had told the managers in Indianapolis that there was this organizing drive going on. He wasn't discredited on the fact that there was an organizing drive. He wasn't discredited on the fact that the day of the Louisville closure, he was sent down to Louisville to pick up some loads, sorry, to pick up some trucks, saw that there were no Quickway employees around, talked to them on the phone, learned what had happened, reported that back to other Indianapolis drivers, including other of the people who were on the organizing team. And it was not discredited to the fact that he told these other people and they said, well, there goes our campaign. And he was not discredited on the fact that after this, he was the only driver who the Teamsters local rep could get on the phone after that. None of the other drivers would talk to the, the Indy drivers would talk to the union rep after that. So even though there is not required to be evidence of chill here, whether the chill is reasonably foreseeable, we do have evidence of actual chill here in Indianapolis. They clearly would see the connection. The Indianapolis drivers said that they were inspired by the Louisville drivers in their organizing drive to start the Indianapolis drivers' own organizing drive. So seeing that the Quickway shut down the Louisville facility shortly thereafter and shortly after bargaining started would show them that likely the same thing was going to happen to them if they proceeded with their statutory rights. Right. As I said, the remedy is presumptively appropriate and it's Quickway's burden to show. Otherwise, they haven't met that burden. I see I'm out of time, so I will stop right there. Thank you. I think we have the intervener. Yes. Thank you, Your Honors. May it please the court. Pamela Newport for the intervener. Teamsters, Local 89. Also, I want to thank you first for accommodating me to appear virtually under the circumstances. I just want to touch on a couple of points. First, I want to talk about the issue of the so-called strike announcement that Mr. Whelan referred to. And Mr. Whelan has argued in such a way to indicate that the union in fact announced this strike and that it was going to happen on December 10th. And I just want to reiterate the point that there is no evidence to suggest that the strike authorization vote that occurred and also to point out that a strike authorization vote is just that. It is not a vote to strike at a particular time. It is a vote to authorize the union to strike if it in fact becomes necessary. So the fact that this anonymous communication to the media talked about a particular date and a particular set of circumstances as to how the strike was going to occur in fact just strengthens the argument that this did not in fact come from the union at all because the record evidence is clear that nobody who actually attended the strike authorization vote was told a particular day or a particular circumstance that would necessitate a strike. So it was completely unreasonable for Quickway to rely on this anonymous communication to then decide that it was going to go into financial ruin, that the sky was falling, and that they needed to shut down a completely profitable facility. I also wanted to mention related to the issue of whether or not other organizing activity was going on. Again, it does not have to be actual knowledge of the activity. Mr. Whelan mentioned that there was activity going on. It was in a different jurisdiction as if that indicated that that could not be evidence used to show that there was an intent to chill organizing activity in other facilities, and that's just not correct. It does not have to be that Local 89 specifically was going to organize them, and also Mr. Whelan at Quickway would not know what communications would go on with the union about how those organizing campaigns were going to occur. Again, we're dealing with what Quickway knew at the time on December 9th when it made the decision to shut the facility down. Essentially, it knew nothing. I think the record evidence that the board relied on is substantial to show that, in fact, there was evidence that their alleged reasoning for shutting down the facility was pretext, that this was happy timing for them to do what it was that they really always wanted to do, which was to get rid of the union. In order for Quickway's argument to be believed that it shut this terminal down solely for financial reasons, the board would have had to accept a lot of things. It would have had to accept that Quickway decided to end a very profitable business based on an anonymous communication without ever reaching out to the union to verify anything about a potential strike. Even if Quickway didn't think the union was going to be truthful, it could have at least had a conversation to gauge whether it thought that there were any substantiations to this allegation. It never considered any sort of other reasonable calculations as to what the damages might be. It simply engaged in this worst-case scenario calculation that the board, based on the record evidence, determined was not reasonable. The board spent a significant amount of time talking about all of the Darlington factors, not just animus, including going through the record and determining why, in fact, Quickway's decision and the stated reasons for its decisions was just not reasonable and not believable, and that, in fact, what Quickway was doing was to close down the facility for an unlawful reason in retaliation for union activity. I see that my time has almost expired, and thank you very much. Thank you. Thank you, Your Honor. Quickway made the decision. It realized that if the KDC shut down, that it was facing serious financial harm and risks, and the decision was based upon what they knew at the time, what they thought the contract provided and what they may be expected to do, and basically their estimates were it could be as much as $2 million to $4 million just in the first couple of days. They also were concerned because they had these, not only that was just potential losses that they would have doing stuff keeping the facility going, but also the morning of the 8th, Obermeyer, who was the vice president of Kroger, told them, this is your problem. We're going to hold you responsible for all of the losses and costs of the KDC shutting down, and you also have to give us assurances that you're going to do everything we tell you you're supposed to do, all these signs we'll make under the agreement. And the three executives sat down, they looked at this, and they started saying, okay, what are we looking at? And they went through the contract. This is undisputed evidence. They went through the contract with Kroger. They went through the potential costs and estimating what it was. Everything you just heard from the union and from the board is second-guessing what the company did. They went a worst-case scenario. I don't think that's true. The board makes a big deal out of the number of trucks and that there was a provision that the only possible reasonable reasoning was to agree with the board, but Quickway in their determinations used less trucks. And basically what it was is they had, this was the circumstances. They were looking at potential $2 million to $4 million. They made $900,000 a year out of the terminal in Louisville. And that's the only terminal we're talking about. There's the thing about other terminals, the company does represent other terminals hundreds of miles away with Kroger, but no business has been done. They lost that contract. It was not renewed, and they closed the facility and they had no business. But Quickway was looking at the costs and expenses that far outweighed what they would make in one year there. More importantly, they had a line of credit, and the board makes no mention of this. They just blow over it because they don't like what it does. But the line of credit was up for the entire company, the entire enterprise. They had $7 million to $7.5 million line of credit available for running the whole company. And that line of credit was terminating. They were negotiating another line of credit, but all they had was just an agreement, a possible agreement in principle, but they didn't have anything down. So they're looking at that. They're looking at losing the line of credit because they would have to report if they started having these kind of losses and payments. Plus, Kroger could offset any losses they have. Think of it. I mean, it's millions of dollars. 242 Kroger stores that are shut down during the holiday season, and QuickWay, they could try to come back and hold QuickWay responsible for that. And they could offset that money against what QuickWay was coming in from income, not only from Louisville, but from other places where they had contracts. So they would have to report that. They felt, and very, very rightly, that the company with the line of credit would shut it down. It would seem that they should have contacted the union to see if the union was really going to strike, if all of these horrible consequences could fall on them. Well, at this time, Your Honor, we think the union should have contacted us. We think, you know, the ALJ found... But is there evidence in the record that the union even knew about this press release? Your friend just told me, no, that they didn't know about the press release. So how did they know to contact you? It's cited. In fact, the dissent points this out. There's evidence that Trafford, who was one of the union organizers, one of the main organizers, had a conversation with Hendricks, who did send it out. Everybody knew that he was the one that sent it out. And it's a text message, and Hendricks says, I didn't... The story was already going. I'd already talked to him before you told me not to talk to anybody about it. There's also... Trafford testified that... Contrary, I mean, one thing that this court has said is if the board disagrees with the ALJ, you have to look very carefully at the record. We encourage the court to do that because there was testimony that Trafford testified, well, we may have gotten a media inquiry, but I don't recall what it was. And so why didn't the union call and say, we don't believe, number one, that the media wouldn't have contacted them about it because they contacted Kroger, and number two, that they wouldn't have known about that. But Kroger, excuse me, they had that. They had the line of credit. If they lost the line of credit, they were out of business. It would have bankrupt them. And the ESOP, Your Honor, there was 4,700 employees that their ESOP would have gone to nothing if the company went bankrupt. Thank you all for your argument. We appreciate it, and the case will be submitted, and the clerk may call the next case.